# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50276 | **DATE** | 3/29/2004 |
| **CASE TITLE** | Davis vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. This case is remanded. This court recommends on remand, the ALJ determine the extent of Plaintiff's pain and whether any weight should be given to her subjective complaints, and if so, determine a new RFC incorporating her pain. This court also recommends the ALJ proceed to Step Five. Defendant's Motion for Summary Judgment is denied

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | 3-30-04 | 19 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/25/2004 | |
| | | | date mailed notice | |
| sp | courtroom deputy's initials | | sp7 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| ANGIE M. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 50276 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Angie M. Davis ("Plaintiff") seeks judicial review of the final decision of the Commissioner

of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The

Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits

("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This

matter is before the Magistrate Judge pursuant to consents filed by both parties on November 5,

2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB on May 21, 2001, alleging disability on April 15, 1994. (Tr. 171).

Plaintiff's application for benefits was denied on July 24, 2001. (Tr. 124). On August 31, 2001,

Plaintiff filed a request for reconsideration. (Tr. 128). Plaintiff's request for reconsideration was

denied on October 12, 2001. (Tr. 130). Plaintiff then filed a request for a hearing before an

Administrative Law Judge ("ALJ") on November 15, 2001. (Tr. 134). Plaintiff appeared, with

counsel, before an ALJ on June 12, 2001. (Tr. 26). In a decision dated November 29, 2002, the ALJ

found that Plaintiff was not entitled to DIB. (Tr. 25). On December 16, 2002, Plaintiff requested

a review of the ALJ's decision by the Appeals Council. (Tr.7). On April 11, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 5).

## II.   FACTS

Plaintiff was born on September 18, 1936 and was sixty-five years old at the time of her June 12, 2002 hearing. (Tr. 35). Plaintiff graduated from high school. (Tr. 36). At the time of her hearing, Plaintiff was living alone. (Tr. 35). Plaintiff stated she has been living alone since her husband passed away in October 2000. (Tr. 36). Plaintiff suffers from back pain, osteoarthritis, heart problems, ischemic colitis, hypertension, visual deficiencies, asthma, allergies, choking sensation, fibromyalgia syndrome, and depression. It is for these reasons that Plaintiff claims to be disabled.

Between 1995 and 1998 Plaintiff worked at the Martin Luther King Center as a tutor. (Tr. 40). Plaintiff would generally tutor first graders and also help with giving the children snacks, arranging tables and chairs, filling in attendance sheets and supervising the lunch period. (Tr. 41). Plaintiff's tutoring consisted of assisting individual students with questions and assisting the teacher with passing out papers and other day-to-day activities. (*Id.*). Plaintiff's job required very little lifting and about one hour out of a two hour day on her feet. Plaintiff's job was eliminated in 1999 because the school ran out of funds for the program. However, Plaintiff testified that she would not be able to perform the job regardless of the funding situation due to her inability to now write. (*Id.*). Specifically, Plaintiff testified that her hands cramp up when she tries to write anything longer than a paragraph. (*Id.*).

From 1961 to 1994, Plaintiff worked at Honeywell. (Tr. 44). At Honeywell, Plaintiff worked in assembly. Plaintiff would assemble and weld switches for airplanes. (Tr. 45). Plaintiff would

2

assemble the parts, the resisters and the dials to the PC board. (*Id.*). Then Plaintiff would enclose the parts in a housing and "solder" them closed. (*Id.*). Plaintiff testified that the most she would lift while working at Honeywell was about twenty to twenty-five pounds. (Tr. 46). The least Plaintiff would have to lift, a tray of switches, was about ten pounds. (*Id.*). In addition to lifting bins and trays, Plaintiff was on her feet for about three to three and half hours a day and about forty-five minutes on her feet continuously. (Tr. 48).

While at Honeywell, for a two year period, Plaintiff worked in the photo lab. (Tr. 50). Plaintiff described her job in the photo lab as requiring her to "use the machine exposed film on the chips." (Tr. 48). To properly perform her job in the photo lab, Plaintiff was required to work with certain chemicals and mix different acids used for cleaning. (Tr. 66). Plaintiff testified that it was the use of these chemicals that caused her asthma and breathing problems. (*Id.*).

A normal day for Plaintiff consists of getting out of bed and fixing breakfast. (Tr. 50). Plaintiff testified she dusts a little around the house, but because Plaintiff lives on her own and does not dirty up the house, Plaintiff stated little cleaning needs to be done. However, on those occasions when vacuuming or mopping is needed, Plaintiff testified her daughter performs such chores. (*Id.*). Plaintiff does all her own shopping and is able to drive herself if needed, but she stated her daughter generally drives and goes with her. (Tr. 51). Plaintiff does all her own cooking, visits her sister once or twice a week (about a ten minute drive from Plaintiff's house), collects recipes as a hobby and volunteers at church. (Tr. 52).

With regards to problems Plaintiff has during her normal day-to-day activity, Plaintiff stated she generally has to do a little at a time. (Tr. 53). Plaintiff's arthritis and stiffness prevent her from being able to perform tasks such a cooking without having to stop and take a break. (*Id.*). Plaintiff

3

testified her arthritis (mainly in her lower back and right knee) "gets bad" three or four days a week and she has to take pain medication everyday. Additionally, when the weather is humid, Plaintiff testified she has a hard time breathing. (Tr. 54). Plaintiff's feet also swell after sitting for a long period of time. (Tr. 56). Plaintiff takes Lozole, a water pill, to combat the swelling in her feet. (*Id.*).

With regards to Plaintiff's other ailments, Plaintiff testified she can walk about a block without experiencing pain, she gets dizzy due to her high blood pressure and reflux/heartburn pain due to her colitis. Plaintiff testified she takes medication for her heartburn which neutralizes any pain associated with the ailment. (Tr. 79). Additionally, although Plaintiff experiences pain and numbness in her hands, Plaintiff testified that she can make a fist with both hands, pick up a button off a flat surface, zip her clothing, pick up a dime off a flat surface, turn the page of a book, turn a doorknob, turn a shower knob, use silverware, and lift ten pounds all with either hand. (Tr. 84). Further, Plaintiff testified she can stand for ten minutes before getting dizzy and sit comfortably for an hour and a half. (*Id.*).

Vocational Expert, Lee Knutson, appeared before the ALJ during Plaintiff's June 2002 hearing. (Tr. 90). Mr. Knutson first testified that Plaintiff's job at Honeywell would be unskilled and light to medium exertion level. (Tr. 92). Mr. Knutson testified that the assembly job would be deemed borderline between light and medium because twenty pounds maximum is light work and Plaintiff testified that she could lift twenty to twenty-five pounds. Mr. Knutson stated Plaintiff's teaching assistant/ tutor work is semiskilled as was Plaintiff's photo lab job at Honeywell. However, both jobs would be light in terms of physical demand. The ALJ then asked Mr. Knutson to assume the following:

> Let's assume a hypothetical female individual who is 57 to 65 years

4

of age, has a high school education with the ability to read, write and use numbers, has the same prior work history as the [Plaintiff] with the capacity to perform work with the following and no other additional limitations. Can lift and carry up to 20 pounds on an occasional basis, 10 pounds frequently. Can sit, stand and walk respectively and with normal breaks for up to six hours each in an eight-hour day. Let's assume further that she may not climb ladders, ropes or scaffolds or otherwise climb ramps and stairs, balance, stoop or crouch and crawl no more than occasionally.

(Tr. 98). Based on the above, Mr. Knutson stated that such an individual could perform light assembly work such as the teaching assistant/tutor job or the lab work, but not the welding. (*Id.*). The ALJ next asked Mr. Knutson to further assume that the individual "wants to avoid concentrated exposure to fumes, odors, dust, gases and other pulmonary irritants and also avoid concentrated exposure ... to mold and pet dander and acids." (Tr. 99). Based on the further limitation, Mr. Knutson stated such limitations would eliminate the lab work. (*Id.*). With those two jobs eliminated, the ALJ then focused on the assembly job. Specifically, the ALJ asked Mr. Knutson, as existing regionally, "how long typically would an individual need to sustain a standing or walking position continuously at one time without being able to sit down for a minute or two?" Mr. Knutson stated that for any light job, whether it is assembly or teaching assistant/tutor, there is going to be a break every two hours. (Tr. 100). Finally, the ALJ asked Mr. Knutson what would be the result if he were to further limit standing and walking to a combined total of two hours in an eight-hour day. (Tr. 101). Mr. Knutson responded that such a limitation would significantly limit the jobs available, but not eliminate them completely, because such a limitation would be deemed sedentary. (*Id.*).

## III.   **MEDICAL HISTORY**

An x-ray of Plaintiff's chest was taken on August 18, 1987. (Tr. 504). Dr. Soman Nair, of Freeport Memorial Hospital, reported that the preliminary finding showed no pathology and her swallowing function appeared normal. (*Id.*). Additionally, Dr. Nair noted that there was no evidence of any Zenker's diverticulum, but a prominent anterior spur at C6-7 was noted. (*Id.*). Overall, Dr. Nair's impression of Plaintiff was that Plaintiff had a mild compression of the posterior aspect of the esophagus due to a cervical spur. (*Id.*).

Plaintiff saw Dr. K.R. Korzec, also of Freeport Memorial Hospital, on September 16, 1987. (Tr. 501). Dr. Korzec reported he saw Plaintiff because she was complaining of a chronic cough that resulted in her tasting blood in her mouth after coughing. (*Id.*). Dr. Korzec used a flexible fiberoptic laryngoscope to evaluate Plaintiff and noted no lesions were found. (*Id.*). While Dr. Korzec reported that he had been treating Plaintiff medically for her cough, Plaintiff's symptoms had failed to abate as of the September 1987 visit and Dr. Korzec recommended an endoscopic evaluation. (*Id.*). Plaintiff had the procedure done on September 16, 1987. (*Id.*). Dr. Korzec reported finding a small (3-4 cm) ulcerated area in the cricoid esphagus on the right side. (*Id.*).

After the procedure, Dr. Korzec recommended Plaintiff see Dr. Frederick Kullberg, of Freeport Ear, Nose and Throat Associates, to combat Plaintiff's chronic cough. (Tr. 544). In preparation for seeing Plaintiff, Dr. Korzec wrote Dr. Kullberg advising him that he had performed an upper airway evaluation and found nothing. Dr. Korzec also indicated to Dr. Kullberg that other procedures have been done but to no avail. (*Id.*).

Dr. Shawn Shianna, of Freeport Ear, Nose and Throat Associates, wrote a letter to Dr. Steven Delheimer, introducing Plaintiff to Dr. Delheimer. (Tr. 541). Dr. Shianna indicated that Plaintiff

had been complaining of pressure in her throat. (*Id.*). However, Dr. Shianna indicated Plaintiff did not have odynophagia, otalgia, nor had Plaintiff been losing weight. (*Id.*). Also, Dr. Shianna reported that Dr. Descourouez, Plaintiff's primary physician, obtained a thyroid scan which showed a thyroid gland at the lower limits of normal size and without any other abnormality. (*Id.*). An examination of Plaintiff revealed the soft tissues of the neck, mouth and oropharynx unremarkable with no abnormality noted in the hypopharynx or larynx. (*Id.*). In conclusion, Dr. Shianna indicated that he thought the cervical osteophyte was the source of Plaintiff's symptoms, and sought Dr. Delheimer's opinion as to whether surgical management of the osteophyte was needed. (*Id.*).

Dr. Delheimer responded to Dr. Shianna on January 17, 1990. (Tr. 537). In writing to Dr. Shianna, Dr. Delheimer noted that Plaintiff's cranial nerves 1-12 are normal and her neck supple. (*Id.*). Dr. Delheimer did however indicate that Plaintiff had a mildly positive left foraminal compression. (*Id.*). After reviewing all his findings, Dr. Delheimer ultimately found that "[i]n view of [Plaintiff's] minimal symptoms, I would not at this time consider surgery which would consist of an anterior dissectomy and fusion with drilling off of the anterior osteophyte." (Tr. 539).

On November 13, 1995, Dr. Shianna referred Plaintiff to Dr. G. Mark Pyle, of the Otolaryngology Head and Neck Surgery, for evaluation of Plaintiff's multiple otologic complaints. (Tr. 533). Dr. Pyle's physical exam of Plaintiff revealed no spontaneous nystagmus with frenzel lenses and Plaintiff's otoscopic examination and standard ENT examination were within normal limits. (*Id.*). However, Dr. Pyle did indicate that Plaintiff's "[o]toneurologic exam was remarkable for abnormal cerebellar testing with finger to nose testing and abnormal Romberg." (*Id.*). Dr. Pyle's impressions were that, based on Plaintiff audiometric testing, her lack of fluctuation, and aural fullness, Plaintiff did not have hydrops, perilymph leak or benign paroxysmal positional vertigo.

(*Id.*). However, based on Plaintiff's history of obesity, hypertension and hypercholesterolemia lab work-up as well as her abnormal eye tracking, Dr. Pyle suggested a microvascular cause. (*Id.*).

Plaintiff saw Dr. Robert Harner, of Swedish American Hospital, for a cardiology consolation on September 16, 1993. (Tr. 832). After performing a physical examination of Plaintiff, Dr. Harner reported Plaintiff's blood pressure was 154/98. (Tr. 833). Plaintiff's thyroid was not enlarged and her lungs were clear. (Tr. 833). Dr. Harner's impressions of Plaintiff were that she had hypertension, headaches likely associated with allergies, and an esophageal problem. (Tr. 834).

Dr. Harner performed a coronary examination of Plaintiff on November 26, 1993 that revealed Plaintiff's left main artery was open, patent and free of disease. (Tr. 830). Plaintiff's left anterior descending and right coronary artery were open, patent and free of disease also. (*Id.*). However, a left ventricular angiogram revealed a slightly dilated ventricle, probably related to obesity, and a slightly thick ventricle probably due to hypertension. (*Id.*).

Plaintiff saw Dr. R. Vyas of Freeport Memorial Hospital on November 30, 1995 for a full colonoscopy. (Tr. 443). Dr. Vyas first indicated that Plaintiff has hypothyroidism, arthritis, asthma, uterine cancer and ringing in her ear. (*Id.*). A colonoscopy examination and polypectomy time three was performed which revealed multiple colonic polyps. (Tr. 444).

Plaintiff saw Dr. George Lagen, of Freeport Memorial Hospital, on March 10, 1997. (Tr. 331). A chest x-ray revealed that Plaintiff's heart was normal and her lungs were clear. (*Id.*). However, an examination of Plaintiff's abdomen revealed a laminectomy defect in L3-L4 and L4-L5. (*Id.*). Dr. Lagen reported Plaintiff possibly suffered from mild paralytic ileus. (*Id.*).

Dr. John Lutz, of Freeport Memorial Hospital, saw Plaintiff on February 6, 1998 because of Plaintiff's recurrent lower back pain. (Tr. 423). Dr. Lutz reported that Plaintiff had a lumbar

laminectomy in 1982 and did fine for ten to twelve years but was starting to have recurrent pain. (*Id.*). At the time, Plaintiff was taking Verapamil, Levoxyl, Premarin, Lodine and Flexeril. (*Id.*). A physical examination of Plaintiff by Dr. Lutz revealed that Plaintiff's heart, lungs, abdomen and spine were all normal. Ultimately, Dr. Lutz opined that Plaintiff was suffering from a failed back syndrome with right lumbar radiculitis. (Tr. 424).

Plaintiff saw Dr. Lagen again on March 11, 1998. (Tr. 320). Dr. Lagen reported Plaintiff had a narrowing of the L5-S1 intervertebral disc space and moderate narrowing of the L3-L4 and L4-L5 intervertebral disc spaces. (*Id.*). Additionally, Dr. Lagen reported a "vacuum phenomenon" within the L3-L4 disc and some spinal stenosis at L3-L4. (*Id.*). Moreover, a fairly severe disc herniation towards the left side at L3-L4 was noted. (*Id.*). Dr. Lagen's impressions were that Plaintiff was suffering from degenerative joint disease with a left sided disc herniation at L3-L4 with spinal stenosis at this level. (*Id.*).

Plaintiff was admitted to Freeport Memorial Hospital for a few days in May/June 1998 for abdominal pain and rectal bleeding. (Tr. 408). Plaintiff saw Dr. Farouk Isawi of Freeport Memorial Hospital on May 29, 1998. (*Id.*). Dr. Isawi performed a physical examination of Plaintiff and diagnosed her as having an inflammatory cyst or pocket collection of fluid in the pelvis, most likely related to a previous pelvic infection. (*Id.*). Also while at Freeport Memorial Hospital, and also on May 29, 1998, Plaintiff saw Dr. Vivek Mehta. (Tr. 406). Dr. Mehta saw Plaintiff due to her abdominal pain. Dr. Mehta reported all x-rays of Plaintiff were unremarkable and revealed nothing as to the cause of her pain. (Tr. 407). Nonetheless, Dr. Mehta attributed her abdominal pain to reflux esophagitis, gastritis, peptic ulcer disease or pancreatic tract disease. (*Id.*). Dr. Mehta attributed Plaintiff's GI bleeding to an upper GI source or a lower GI source. (*Id.*).

On August 4, 1998, Dr. George Bovis, of the Mayo Clinic's Gastroenterology and Hepatology Department, performed a physical examination of Plaintiff. (Tr. 524). Dr. Bovis indicated Plaintiff's general health was well developed, her skin was normal, her eyes conjuctive and lids normal, her thyroid normal without masses and her heart normal without murmurs. (*Id.*). Dr. Bovis saw Plaintiff again three days later on August 7, 1998. (Tr. 523). A neurological examination of Plaintiff revealed mild stenosis at the L3-4 level above the level of the fusion with some bulging discs and ligamentous hypertrophy. (*Id.*). Additionally, lumbosacral x-rays shows degenerative change at L4-5, decompressive laminectomy with L4 to S-1 insitu fusion. (*Id.*). Plaintiff also had an elevated sedimentation rate of 74, which cannot be explained from Plaintiff's medical history. (*Id.*).

Plaintiff started to see Dr. R. Singh, of the Freeport Clinic's Department of Rheumatology, on June 8, 1999. (Tr. 763). Dr. Singh reported that Plaintiff had been experiencing pain in both her legs, with pain more prominent in her right leg. (*Id.*). Plaintiff even went so far as to state to Dr. Singh that at times it feels as if "her right knee might give out." (*Id.*). An examination and x-ray of Plaintiff's knees revealed "some evidence of DJD in the PIP and DIP joints." (Tr. 764). An examination of Plaintiff's knees further revealed femoral crepitus, especially on the right knee with slight valgus deformity and tenderness over the lateral joint lines. (*Id.*).

Dr. Mehta performed a colonoscopy and an EGD on Plaintiff on August 13, 1999. (Tr. 383). Dr. Mehta reported that Plaintiff was having bowel troubles prior to the procedure. The procedures revealed that Plaintiff suffered from reflux esophagitis with a small hiatal hernia, Schatzki ring, and small gastric polyps. (Tr. 384). Dr. Mehta started Plaintiff on medication to combat the abdominal pain and intestinal blockage. (*Id.*).

On February 22, 1999, Dr. Bhadresh Patel, of Freeport Health Network's Cardiovascular Disease, wrote Dr. Descourouez. (Tr. 392). Dr. Patel indicated Plaintiff was evaluated with cardiac catheterization at Freeport Memorial Hospital because of an abnormal pharmacologic stress test with Persantine Sestamibi. (*Id.*). While Dr. Patel indicated Plaintiff had an elevated left ventricular and diastolic pressures, her coronary angiogram did not show any significant obstructive disease. (*Id.*). As such, Plaintiff was released from the hospital.

Plaintiff had a CT and pelvis exam on October 30, 2000. (Tr. 302). Dr. Soman Nair reported that a pre-contrast CT scan of the liver and post contrast CT scan of the abdomen and pelvis showed no pathology in the liver or pancreas. (*Id.*). Plaintiff's kidneys were within normal limits. (*Id.*). An oval soft tissue lesion on the right side of the pelvis at the level of the hip joint was present. (*Id.*). No other abdominal or pelvic mass lesion, fluid collections or inflammatory changes were noted. (*Id.*).

In March 2001, Plaintiff began to experience numbness in her fingers. On March 23, 2001, Plaintiff saw Dr. K. Mulcahey of Freeport Health Network. (Tr. 272). Dr. Mulcahey reported that Plaintiff was experiencing numbness or tingling in her fingers. (*Id.*). While she reported to Dr. Mulcahey that she had not dropped anything nor had she changed her daily activities, her mood was becoming more depressed as a result of the numbness. (*Id.*). Dr. Mulcahey performed an examination of Plaintiff and determined that Plaintiff had weakness in her hands and possible depression. (*Id.*).

Medical Consultant, Dr. Fancis Vincent, filled out a Residual Functional Capacity Assessment form on Plaintiff for the Commissioner on July 13, 2001. (Tr. 452-459). In Dr. Vincent's opinion, Plaintiff can lift twenty pounds occasionally, ten pounds frequently, stand and/or

walk for about six hours in an eight hour workday, sit about six hours in an eight hour workday and push and/or pull an unlimited amount. (Tr. 453). In terms of other limitations, Dr. Vincent found Plaintiff has no postural, manipulative, visual, communicative or environmental limitations.

Plaintiff saw Dr. Patel again on December 31, 2001. (Tr. 780). By way of background, Dr. Patel reported Plaintiff has a history of hypertension with possible hypertensive cardiovascular disease, history of fibromyalgia, history of ischemic colitis, and a history of degenerative disc disease. (*Id.*). Dr. Patel also reported that Plaintiff was seeing her because a recent evaluation by Dr. Alexander Locascio revealed an EKG which demonstrated anterior wall T-wave abnormality. (*Id.*). After performing other tests, Dr. Patel reported that Plaintiff's "EKG looks similar to the EKG from January of 1999 and she had a normal coronary angiogram. Her symptoms are very nonspecific and it gives me an impression that most likely she does not have any underlying obstructive coronary artery disease." (*Id.*).

Plaintiff saw Dr. Locascio in early 2002. (Tr. 614). Specifically, Plaintiff saw Dr. Locascio on January 3, 2002 due to tinnitus and vertigo. (*Id.*). While Plaintiff denied having any ear pain or a fever, Dr. Locascio did report Plaintiff claimed to have had episodes of vertigo. (*Id.*). A physical examination of Plaintiff revealed that her blood pressure was 125/54 and her heart, lungs and abdomen were all normal. (*Id.*). Dr. Locascio prescribed Antivert and recommended Plaintiff see Dr. D. Mirza.

Plaintiff saw Dr. Mirza on February 5, 2002. (Tr. 518). A complete review of Plaintiff's system revealed Plaintiff has: cataracts but no visual loss, tinnitus with no epistaxis or sore throat, no chest pain, shortness of breath but no wheezing, occasional heartburn, no increased frequency or dysuria, arthralgia, no depression, sickle cell trait, and asthma but no hay fever. (Tr. 519). A

complete physical examination of Plaintiff was also performed which revealed nothing abnormal. (*Id.*). Ultimately, Dr. Mirza's impressions of Plaintiff were that she suffered from right sided tinnitus, a history of Meniere's disease, sickle cell trait, hypothyroidism, hypertension, asthma, fibromyalgia and peripheral neuropathy. (Tr. 520).

Plaintiff saw Dr. Locascio again on March 6, 2002 due to a lower respiratory infection. (Tr. 642). As of March 6, 2002, Plaintiff was taking the following medications: Premarin, Levoxyl, Verapamil, Nexium, Celebrex, Ultram, Potassium, Vitamin E, Vitamin C, Glucosamine Condroitin, Insulin and Azmacort inhaler. (*Id.*).[1] A review of Plaintiff's symptoms by Dr. Locascio revealed that Plaintiff's MRI of her brain was negative and Plaintiff denied suffering from nausea, vomiting, diarrhea, fevers, chills, chest pain or shortness of breath. However, Dr. Locascio did report Plaintiff continued to suffer from vertigo. (*Id.*). Also on March 6, 2002, Dr. Raymond Alberts performed an extracapsular cataract extraction of Plaintiff's right eye. (Tr. 648). The procedure appeared to have been successful. (*Id.*). Dr. Alberts later (on April 24, 2002) performed the same procedure on Plaintiff's left eye. (Tr. 640).

On May 24, 2002, Dr. Descourouez, reported that based on his medical findings, Plaintiff is limited to less than sedentary work. (Tr. 759). Specifically, Dr. Descourouez reported Plaintiff would not be able to sedentary work and could not meet the demands of competitive employment in doing sedentary work and certainly could not do her former job at MicroSwitch. (*Id.*). Also of note, but not dated, Dr. Shianna filed out a Persons with Disabilities Certification for Parking Placard for Plaintiff. (Tr. 532). Dr. Shianna checked two of the six options listed for the reason the parking

---

[1] This list later grew to include the following: Lazal, Calcium supplements, Vitamin B6 and Nasonex. (Tr. 223).

placard is needed. Dr. Shianne checked the "is restricted by lung disease to such a degree that the person's forced expiratory volume in one second, when measured by spirometry, is less than one liter" and also the "is severely limited in the person's ability to walk due to an arthritic, neurological, or orthopedic condition" options. (*Id.*).

## IV.    **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a

14

reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir.

2000), *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination

is based upon the ALJ's subjective observation of the witness, the determination may only be

disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d

473, 487 (7th Cir. 1993), *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986), cert. denied.

"However, when such determinations rest on objective factors of fundamental implausibilities rather

than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision."

*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384

(N.D. Ill. 1995).

## V.   **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and

accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or

mental impairment is one "that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant

is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[2] The Commissioner sequentially

---

[2]The Commissioner has promulgated parallel regulations governing disability
determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic
simplicity, future references to Part 416 of the regulations will be omitted where they are

determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III,

---

identical to Part 404.

[3]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age,

education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on November 29, 2002. (Tr. 25). Specifically, the ALJ found that while Plaintiff receives a monthly pension annuity and worked part-time occasionally, these things did not count as disqualifying substantial gainful activity. (Id.). As such, the ALJ found that Plaintiff satisfied the "disability insured status requirements on the asserted disability onset date, but she only continues to satisfy these requirements until June 30, 2001." (*Id.*).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

18

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffers from medically determinable fibromyalgia syndrome, degenerative disease of the lumbar and cervical spines; degenerative disease of the knees and hands; asthma; ischemic colitis; hypertensive heart disease; and a history of cataracts. (Tr. 12). The ALJ found these impairments satisfy the severity requirements under the Social Security Act. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This court finds no reason to disturb the ALJ's determination. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 12). The ALJ, very thoroughly, stated the following:

> Her medical condition does not satisfy section 1.04 (spinal disorder) of the Listing of Impaiments, because the [Plaintiff] does not have motor loss or positive straight leg raising testing in both the supine and sitting positions. Her medical condition does not satisfy section 1.02, although [Plaintiff] does have osteoarthritis involving the knees.

The osteoarthritis of the knees has not resulted in an inability to ambulate effectively, as required under that section. Her condition does not satisfy section 1.07, despite the argument that her medical condition equals this section regarding fractures of an upper extremity with nonunion of the fracture, as the [Plaintiff] has not fractured the humerus radius, or ulna bones. The changes regarding arthritis of the [Plaintiff's] finger joints do not satisfy section 1.02(B) of the Listing of Impairments, a more closely applicable listing, as the [Plaintiff] can use her hands. The argument as to section 1.08, the soft tissue injury section, was likewise not persuasive. Each of the requirements of this section has not been established of record. She does not satisfy section 3.03 of the Listing of Impairments, despite the argument that she does. She does not have chronic asthmatic bronchitis, nor has she required frequent intervention for frequent asthma attacks. Even though it was argued that her heart condition satisfies the cardiac section, her medical condition does not satisfy sections 4.02 or 4.04 of the Listing of Impairments for the following reason: She does not have chronic heart failure. She also does not have ischemic heart disease. Finally, the records fails to reflect findings of equivalent significance to those required findings missing from the cited sections of the Listings.

(Tr. 12-13). Such an analysis by the ALJ allows this court to follow the ALJ's reasoning and proceed without question to the next step of the disability determination process.

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is able to perform her past relevant work. Before proceeding however, the ALJ had to determine Plaintiff's Residual Functional Capacity ("RFC"). The ALJ found that from April 15, 1994 through January 30, 2001, Plaintiff could

lift more then twenty pounds occasionally, ten pounds frequently, and

> sit, stand and walk, respectively and with normal breaks for up to six
> hours each in an eight hour day (but could not stand/or walk for longer
> than one hour continuously, without being able to sit for one to two
> minutes); could not climb ladders, ropes or scaffolds, but could
> otherwise climb ramps and/or stairs, balance, stoop, kneel, crouch, and
> crawl no more than occasionally; must have avoided concentrated
> exposure to allergens including mold, pet danders, and acids and
> concentrated exposure to fumes, odors, dusts, gasses and other
> pulmonary irritants; and must have avoided exposure to hazards as
> exposed unprotected heights or excavations and to
> exposed/unprotected dangerous machinery.

(Tr. 13). Further, the ALJ found that from January 31, 2001 through and including June 30, 2001,

the Plaintiff had the same limitations as above with the following additional limitations:

> Plaintiff could lift and/or carry up to ten pounds occasionally and five
> pounds frequently; stand and/or walk for up to a combined total to two
> hours in an eight hour day; and must have avoided exposure to
> hazards, such as exposed/unprotected heights or excavations and to
> exposed unprotected dangerous machinery.

(Tr. 13). Taking into consideration that Plaintiff's prior work as a tutor was light and semi-skilled,

her work as a switch assembler was light to medium unskilled, her work in the photo lab was semi-

skilled and light and her work as a spot-welder was medium semi-skilled in nature, the ALJ found

that during the two different time periods as outlined above and the limitations during those time

periods, Plaintiff could perform the switch assembly job at the sedentary level.

While Plaintiff makes numerous arguments against the ALJ's ultimate decision, this court

will focus on one – Plaintiff's argument that the ALJ neglected to provide specific reasons for his

adverse credibility finding. Specifically, Plaintiff argues that the ALJ's adverse credibility finding

is unsupported given Plaintiff's strong work history (33 years with one employer), the opinion of two

treating physicians that she was disabled, and the fact that Plaintiff has numerous aliments for which

she receives medication and is under constant medical supervision. (Pl's Mem. at 7). Defendant so

much as agrees with Plaintiff in this respect, except Defendant argues that "[w]hile Plaintiff is correct in her assertion that these factors would ordinarily militate in favor of finding her allegations of disability credible, the ALJ properly considered other relevant factors in making his final decision such as Plaintiff's use of medication, daily activities, and course of treatment." (Def.'s Mem. at 11). Defendant cites as support for its argument the fact that Plaintiff's activities of daily living include such varied tasks as grocery shopping, cooking, dusting, reading and visiting with her family." (*Id.*). Additionally, Defendant argues the ALJ notes that Plaintiff "did not take any strong pain medication and that she had not undergone further surgery, despite her allegations of disabling arthritis and fibromyalgia symptoms." (*Id.*). While this court tends to agree with Defendant, the recent Seventh Circuit case of *Carradine v. Barnhart*, 2004 WL 444575 (7th Cir. Mar. 12, 2004) demands this court remand this case.

In *Carradine*, plaintiff, when she was 42 years old, applied for social security benefits following a back injury from a slip and fall on ice. *Id.* at, *2. The ALJ acknowledged that plaintiff "has a severe impairment ... . She has upper body pain and right hand numbness. [Medical] records establish objective evidence of a medical condition that would cause limitations of work capacity." *Id.* As a result of her fall, plaintiff started to see a "large battery of physicians" and was diagnosed with a variety of ailments, including degenerative disc disease, scoliosis, depression, fibromyalgia, and somatization disorder.[4] The issue the Seventh Circuit faced in *Carradine* was not whether the various conditions existed but their severity and whether the conditions caused plaintiff such severe pain that plaintiff could not work full time.

---

[4] In the instant case, Plaintiff suffers from the same ailments as the plaintiff in *Carradine* with the exception of somatization disorder.

In addressing this question, the Seventh Circuit started its analysis by first stating that "[m]edical science confirms that pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant." *Id.*, at *1 (citing Dennis C. Turk & Akiko Okifuji, "*Assessment of Patients' Reporting of Pain: An Integrated Perspective,*" 353 LANCET 1784 (1999). As such, "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)). Rather, an individual's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability. In fact, in certain situations, pain alone can be disabling, "even when its existence is unsupported by objective evidence." *Id.* (citing *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(per curiam)).

After addressing physical versus psychological pain,[5] the Seventh Circuit turned to the ALJ's failure to consider that difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week. The plaintiff in *Carradine* did not claim to be in wracking pain every minute of the day, and in fact, when

---

[5]This court especially notes the following statement by the Seventh Circuit that it is improbable that plaintiff "is a good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms. Such an inference would amount to an accusation that the medical workers who treated [plaintiff] were behaving unprofessionally." *Carradine*, 2004 WL 444575, at *3. The current medical record before this court contains some 900 pages and a list of some sixteen medications that Plaintiff was taking for her ailments. See Tr. 223. This court too finds it hard to believe that Plaintiff is a good enough actress to accumulate such a lengthy medical record and be prescribed some sixteen medications that she must take daily to alleviate her pain.

feeling better, plaintiff was able to drive, shop and do housework. However, the Seventh Circuit found these activities did not consume a substantial part of plaintiff's day and some of the activities, such as walking, were actually done for therapeutic reasons. *Id.* at, *4.

The facts in *Carradine* are very similar (but of course not exact) to the instant case. In the instant case, Plaintiff suffers from fibromyalgia syndrome, degenerative disease of the lumbar and cervical spines; degenerative disease of the knees and hands; asthma; ischemic colitis; hypertensive heart disease; and a history of cataracts. Plaintiff has had x-rays, MRIs, CAT scans, and exams from many medical doctors and specialists. Plaintiff's spine was operated on in 1982 and continued to cause her problems and pain. (Tr. 320, 504, 537, 913). Plaintiff had an abnormal cerebellar testing with finger to nose testing and abnormal Romberg and abnormal eye tracking with saccadic pursuit in both directions. (Tr. 533). Plaintiff has been treated for asthma and numerous cardiac problems. In 1987 Plaintiff had a direct laryngoscope and biopsy with an ulcerated area in the crinoid esphagus noted. Plaintiff suffers from a choking and gagging sensation. She stumbles and falls occasionally. Plaintiff testified she can walk about a block without pain and can stand for ten minutes before getting dizzy. A CAT scan showed compression of the esophagus. Plaintiff complains of abdominal pain and gastric problems. Her knees bother her from arthritis even with physical therapy. She has numbness and tingling in her toes. Plaintiff's hands hurt and have progressively gotten worse, although Plaintiff testified she can occasionally pick up a button, zip her clothing, pick up a dime, or turn a doorknob. Heberden's nodes are found in her fingers (generally associated with osteoarthritis). Finally, Plaintiff takes sixteen different types of medications daily for her various ailments. (Tr. 223).

What troubles this court is, based on the above ailments Plaintiff suffers from, the ALJ ended

24

at Step Four. Given all Plaintiff's ailments and pains, it is hard to fathom how Plaintiff can perform

any type of assembly position. Plaintiff elicited testimony from the vocational expert stating as

much.[6] As the Seventh Circuit stated on *Carradine*, this court questions whether Plaintiff can work

eight hours a day five consecutive days of the week with her current pains and ailments. The record

before this court makes answering this question impossible at this time. Additionally, the ALJ's

reliance on activities such as cooking, dusting, driving to the store and reading to discredit the

Plaintiff's subjective pain are improper based on *Carradine*. 2004 WL 444575, at *4. Plaintiff does

not perform these activities every minute of every day and based on the record this court is not sure

how much of Plaintiff's day is pain free and how much consists of pain.

This court is not suggesting that Plaintiff is disabled and in fact her pain may be exaggerated.

However, this court questions the ALJ's stopping at Step Four of the disability process. On remand,

this court recommends the ALJ determine the extent of Plaintiff's pain and whether any weight

should be given to her subjective complaints, and if so, determine a new RFC incorporating her pain.

Additionally, this court recommends the ALJ proceed to Step Five.

---

[6] Q:    Realistically speaking with assembly work the light and the sedentary, realistically speaking, how often must you be able to perform fine manipulation such as fingering and pinching, would this be a requirement of being able to frequently doing so, less than frequently or what?

VE:    I think it'd be frequently.

Q:    Okay. So –

VE:    Frequently at least, you know, with assembly you work with small parts all the time.

Q:    All right. So if one were limited to occasional fine or gross manipulation that would eliminate the assembly work?

VE:    Yes it would.

(Tr. 108).

## VII. CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. This case is remanded. This court recommends on remand, the ALJ determine the extent of Plaintiff's pain and whether any weight should be given to her subjective complaints, and if so, determine a new RFC incorporating her pain. This court also recommends the ALJ proceed to Step Five. Defendant's Motion for Summary Judgment is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 3/29/04